IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

JEFFREY LAKE DEV. V. CENTRAL NEB. PUB. POWER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JEFFREY LAKE DEVELOPMENT, INC., A NEBRASKA NONPROFIT CORPORATION,
AND MIDWAY WILDLIFE & RECREATION CLUB, A NEBRASKA NONPROFIT
CORPORATION, ET AL., APPELLANTS AND CROSS-APPELLEES.

V.

CENTRAL NEBRASKA PUBLIC POWER AND IRRIGATION DISTRICT, A NEBRASKA
PUBLIC CORPORATION, APPELLEE AND CROSS-APPELLANT.

Filed June 7, 2016.    No. A-15-277.

Appeal from the District Court for Lincoln County: RICHARD A. BIRCH, Judge. Affirmed.

Steve Windrum, of Malcom, Nelsen & Windrum, L.L.C., for appellants.

David J.A. Bargen, of Rembolt Ludtke, L.L.P., for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

RIEDMANN, Judge.

### INTRODUCTION

This case involves lakeside land owned by the Central Nebraska Public Power and Irrigation District (Central) that lies adjacent to hydroelectric power projects. Central leased portions of this lakeside to Jeffrey Lake Development, Inc. (Jeffrey) and Midway Wildlife & Recreation Club (Midway) for development of private recreational cabins. These leases have been the subject of significant litigation over the past 20 years. The primary issue of the current appeal is the meaning of contractual language setting elevation restrictions for certain types of construction on the leased land. The district court interpreted the language of the lease to prohibit construction of cabins, including subterranean support structures, below stated elevation levels.

However, the district court also construed our holdings from prior appeals to allow repair or replacement of nonconforming structures that were the subject of a prior injunction against lease enforcement. Following our review of the record and the parties' arguments, we affirm the judgment of the district court.

BACKGROUND

The leases at issue in this case have been the subject of considerable litigation, reaching the Court of Appeals or the Nebraska Supreme Court at least 6 prior times. We most recently considered the leases between the parties in *Jeffrey Lake Dev., Inc. v. Cent. Nebraska Pub. Power & Irrigation Dist.*, No. A-09-996, 2010 WL 2990040 (Neb. App. July 27, 2010) (hereinafter "*Jeffrey VI*"). We briefly recount the background of this appeal here, and will discuss additional details of the leases and prior litigation in the analysis section below as needed.

Central entered into leases with Jeffrey and Midway in 1980 and 1981, respectively. The leases are similar, with many identical provisions, and provide for Jeffrey and Midway to lease residential cabin areas and lots above the shorelines of each lake. The leases extend for a primary term of 31 years and contain an automatic renewal provision.

In *Jeffrey VI*, Central attempted to terminate both leases based in part upon alleged elevation violations of various structures. We determined that because Central had not previously enforced those violations, it was enjoined from declaring a forfeiture of either lease based on any of the alleged violations on which it adduced evidence at trial. *Jeffrey Lake Dev., Inc. v. Cent. Nebraska Pub. Power & Irrigation Dist.*, No. A-09-996, 2010 WL 2990040 (Neb. App. July 27, 2010). However, we determined that Central could enforce future lease violations. *Id.* The parties now dispute the meaning of the elevation requirements in the leases, as well as the extent of the injunction outlined in *Jeffrey VI*. Both leases prohibit some types of construction at elevations below a specified "freeboard elevation" -- that is, an elevation somewhat above the high water level of the lakes. This restriction is intended to prevent flood damage that would harm structures and the hydroelectric project.

At trial, Jeffrey and Midway submitted testimony from several of their sublessees to whom Central has denied building permits based on its interpretation of the leases' elevation restrictions. Timothy Dilley testified that he is a sub-leaseholder on Jeffrey Lake. He entered into his sublease in 2010 with the hope of building a retirement home on the property. When Dilley executed the sublease for his lot, the lot contained a garage, an electrical service, a septic system, a well, several hydrants, and a concrete pad approximately 9′ wide by 20′ long. The lot had previously contained a smaller modular home, but that home had been destroyed and removed from the premises before Dilley obtained his sublease.

Dilley submitted a permit application to Central for retaining walls, a driveway, and a larger septic system to support the house he hoped to build. The proposed septic system would replace the existing, smaller septic system in approximately the same location. Central denied the septic system application because the subterranean tank and drain field proposed by Dilley extend below the Jeffrey Lake lease's freeboard elevation of 2,764 feet above sea level. The Dilleys' permit for a driveway was initially denied, then approved provided that Dilley use fill dirt to raise the elevation of the driveway to 2,764 feet. Central informed Dilley that retaining wall footings also had to be above 2,764 feet in elevation. Central invited Dilley to re-submit conceptual

drawings of the retaining walls, driveway, house, and septic tank, stating that it believed there was a "good chance" everything would be approved, so long as the septic tank and drain field were modified to be constructed entirely above 2,764 feet in elevation. Central employees testified that they believed that alternative locations or alternative septic system types would have met Central's requirements and allowed the Dilleys to build the size of septic system they desired. Central suggested that an above-ground holding tank system recently installed on a lot at Midway Lake might provide an example of a system that would meet elevation and setback requirements. However, Dilley and his sewage contractor testified to their belief that alternative sewage system locations were not feasible and that an above-ground holding tank system would require more frequent pumping and be more susceptible to freezing. Dilley did not submit an amended application to Central.

Dell Shepherd testified that he is a sub-leaseholder at Jeffrey Lake and has been since 1981. In 2013, Shepherd submitted an application for an addition to his cabin and modification of his sewage, heating, and air conditioning systems. His applications were initially approved subject to an elevation inspection. After inspection, Central informed Shepherd that he could not build as proposed because of elevation restrictions in the Central-Jeffrey lease. Central suggested an above-ground holding tank instead of a septic tank to avoid elevation issues. Central also suggested that a slab foundation rather than a block foundation "might be a possibility" for his cabin addition. Shepherd's contractor felt that a slab foundation would be inappropriate because the rest of the cabin was block foundation. Shepherd testified that he was uninterested in submitting a re-application after the denials.

Evidence in the record also reflects that in 2013 Central denied another Jeffrey Lake sub-leaseholder a permit to demolish and replace a home on her lot because of elevation requirements in the lease as well as horizontal setback-from-the-shoreline requirements contained in Central's permitting procedures. We note that the validity of the horizontal setbacks in the permitting procedures are not at issue on this appeal. Evidence in the record also reflects that at least one sub-leaseholder's application to construct an underground sprinkler system was denied because of elevation.

Michael Drain, a Central employee, testified that sub-leaseholders whose permits were denied could submit a new application that includes a variance request. The mechanism to request a variance does not appear in either of the leases, but rather in Central's permitting procedures, which it developed as part of its separate license with the Federal Energy Regulatory Commission (FERC). A provision of the lease requires sublessees to comply with terms of Central's FERC license. Central's permitting procedures on file with FERC allow for new construction of residences at Jeffrey Lake and the Midway Lakes with the lowest living elevation significantly lower than those required by the lease. However, the permitting procedures also state that a more-restrictive condition in a lease will control over a more-permissive condition in the permitting procedures.

In 2013, Jeffrey and Midway filed this action seeking (1) a declaratory judgment interpreting paragraphs 13, 14, 15, and 16 of each of the leases to allow construction of residential cabins and related structures that extend at least in part below the listed elevations, (2) a finding that Central is in breach of its lease, (3) a permanent injunction prohibiting Central from denying applications for construction that comply with this interpretation of the restrictions; (4) and for

damages, attorney fees, and costs. The trial court determined that paragraph 13 prohibited construction of residential cabins and related structures, including subterranean structures such as footings and sewage systems, below the stated elevations. The trial court further found that these elevations do not apply to boat docks and related structures. Additionally, the trial court interpreted the injunction we prescribed in *Jeffrey VI* to prohibit Central from enforcing elevation restrictions for repair and replacement of the structures at issue in *Jeffrey VI*, so long as the repair or replacement is of the same type of item in the same location. The trial court also held that the specific language of the elevation restriction in the lease concerning Jeffrey Lake required only that building "generally" complied with the elevation requirement -- that is, slight deviations from the required elevation are permitted under that lease only. The remainder of Jeffrey and Midway's request for relief was denied.

Jeffrey and Midway appeal from this order, and Central cross-appeals.

## ASSIGNMENTS OF ERROR

To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the party's brief. *Stekr v. Beecham*, 291 Neb. 883, 869 N.W.2d 347 (2015). Additionally, an appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it. *Facilities Cost Mgmt. Group v. Otoe. Cty. Sch. Dist.*, 291 Neb. 642, 868 N.W.2d 67 (2015). Therefore, to the extent that assignments of error are not specifically argued or are consumed within a broader argument, we consolidate the assignments and consider only those that are specifically argued and are necessary to adjudicate the appeal before us.

Jeffrey & Midway assign, restated and reordered, that the district court erred in (1) failing to consider the terms of paragraphs 14, 15, and 16 of the leases and failing to interpret paragraphs 13, 14, 15, and 16 together to allow construction of at least some parts of residence cabins and related structures below the specified elevations; (2) interpreting erosion control structures, retaining walls, and wells to categorically fall under exceptions to the elevation requirements; (3) finding that the *Jeffrey VI* injunction applied only to construction upon which evidence was produced in *Jeffrey VI*, and that repair or replacement of structures covered by the *Jeffrey VI* injunction must be the same type of item in the same location; (4) interpreting the word "generally" in paragraph 13 of the Jeffrey lease by referencing our discussion of that provision in *Jeffrey VI*; (5) failing to issue an injunction prohibiting Central from denying applications for construction that comply with the elevation requirements contained in its permitting procedures; (6) finding Central's motivation in its enforcement of the contract to be immaterial; and (7) failing to award Jeffrey and Midway attorney fees.

On cross-appeal, Central assigns that the district court erred in (1) failing to find that Jeffrey and Midway failed to state a claim and that the district court lacked subject matter jurisdiction by operation of res judicata; (2) failing to find Jeffrey and Midway's claims were barred by waiver; (3) applying *Jeffrey VI*'s injunction to extend to repair and replacement of the same type of items in the same locations; and (4) applying our definition of "generally" from *Jeffrey VI* in interpreting the elevation restriction at Jeffrey Lake.

STANDARD OF REVIEW

An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. *Wetovick v. County of Nance*, 279 Neb. 773, 782 N.W.2d 298 (2010). When a dispute sounds in contract, the action is to be treated as one at law. *Spanish Oaks v. Hy-Vee,* 265 Neb. 133, 655 N.W.2d 390 (2003). This court treats the determination of factual issues in such a declaratory judgment action which was tried without a jury in the same manner as any other action at law; accordingly, the findings of the trial court have the effect of a verdict and will not be set aside unless clearly wrong. *Donaldson v. Farm Bureau Life Ins. Co.*, 232 Neb. 140, 440 N.W.2d 187 (1989). When a declaratory judgment action presents a question of law, an appellate court decides the question independently of the conclusion reached by the trial court. *Vlach v. Vlach*, 286 Neb. 141, 835 N.W.2d 72 (2013).

The construction of a contract is a question of law, and is reviewed de novo. *Labenz v. Labenz,* 291 Neb. 455, 866 N.W.2d 88 (2015).

An action for injunction sounds in equity. *Lambert v. Holmberg*, 271 Neb. 443, 712 N.W.2d 268 (2006). In an appeal of an equity action, an appellate court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court. *Hogelin v. City of Columbus,* 274 Neb. 453, 741 N.W.2d 617 (2007). A party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief. *Abboud v. Lakeview,* 237 Neb. 326, 466 N.W.2d 442 (1991).

On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *Vlach v. Vlach*, *supra*. (2013).

ANALYSIS

*Interpretation of Elevation Requirements in Leases.*

The primary dispute on appeal concerns interpretation of the construction elevation requirements contained in paragraphs 13, 14, 15, and 16 of the Jeffrey and Midway leases with Central. Jeffrey and Midway assign that the district court erred in failing to interpret paragraphs 14, 15, and 16 of the lease in its order, and more specifically in failing to construe those paragraphs jointly with paragraph 13 to permit construction of at least some parts of residential cabins and related structures below the minimum elevation described in paragraph 13 of each lease. We recognize that the district court failed to discuss paragraphs 14, 15, or 16 in its order. However, because we agree with the conclusion reached by the district court after we independently interpret all of the paragraphs jointly, we affirm the district court's judgment.

A lease agreement is to be construed as any other contract. *Johnson Lakes Dev. v. Cent. Nebraska Pub. Power*, 254 Neb. 418, 576 N.W.2d 806 (1998). In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Id.* A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* The determination of whether a contract is ambiguous is to be made on an objective basis, not by the subjective contentions of the parties suggesting opposing meanings of the disputed language. *Id.* The terms of a contract are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them. *Id.*

Here, neither party contends that the leases are ambiguous. We have previously examined the same lease provisions as part of a prior appeal between these parties, and determined as a matter of law that these leases are not ambiguous. *Jeffrey Lake Dev., Inc. v. Cent. Nebraska Pub. Power & Irrigation Dist.*, No. A-03-106, 2004 WL 2216494 (Neb. App. Oct. 5, 2004). We adhere to our previous decision.

Extrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous. *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 291 Neb. 642, 868 N.W.2d 67 (2015). When a contract is unambiguous, the intentions of the parties must be determined from the contract itself. *Id.* Accordingly, we refer only to the terms of the contract to interpret the paragraphs at issue.

Paragraph 13 contains elevation restrictions prohibiting certain types of construction below each lake's freeboard elevation. We have previously determined the "freeboard area" referenced in these paragraphs to be the surface of the ground between the level of water, i.e., the shoreline, and the normal high water level specifically designated by measured elevations in the particular lease agreements. *Jeffrey Lake Dev., Inc. v. Cent. Nebraska Pub. Power & Irrigation Dist.*, No. A-03-106, 2004 WL 2216494, at *11 (Neb. App. Oct. 5, 2004).

Each lease has similar, but slightly different wording of the restrictions in paragraph 13. The Jeffrey lease provides:

> (13) All permanent construction of private residence cabins and related structures shall be placed generally above the freeboard contour of the lake which is Elevation 2764.0 feet above sea level, U.S.G.S. datum, except that boat docks and such related structures for access to or for the use of water facilities may be constructed below said lake freeboard contour elevation. Such structures shall comply with all relevant federal, state and local statutes and regulations in existence, shall first be approved by [Jeffrey] and [Central] in writing, and shall be constructed entirely at the risk of the sublessee so constructing, using or maintaining these boat docks and related structures. Such structures shall be subject to the use of the storage facilities of said lake as may be desired by [Central], all without notice to [Jeffrey] or to any sublessees holding by, through or under this Agreement.

Paragraph 13 of the Midway lease similarly provides for elevation restrictions for construction, and also requires a horizontal setback from the shoreline:

> (13) All permanent construction of private residence cabins and related structures shall be located back of a buffer or clear zone of not less than thirty (30) feet, measured horizontally, and not less than five (5) feet, measured vertically, from the normal high water elevations of said lakes. Said normal high water elevations, being above sea level U.S.G.S. datum, are 2635.3 feet on Central Midway Lake and 2635.1 feet on Walker Lake and Glen Young Lake. Boat docks and related structures for access to or for use of water facilities may be constructed on the shoreline below said freeboard contour elevations. Such structures shall comply with all relevant federal, state and local statutes and regulations in existence, shall first be approved by [Midway] and [Central] in writing, and shall be constructed entirely at the risk of the sublessees so constructing, using or maintaining these boat docks and related structures. Such structures shall be subject to the use of the water storage facilities of said lakes as may be desired by [Central], all without notice to [Midway] or to any sublessees holding by, through or under this Agreement. Construction of cabins and related

structures as well as boat docks and related structures is forbidden on or along any of the canal areas.

Central asserts that paragraph 13 of each lease means that all cabins, including subterranean support structures for those cabins such as footings and drainage fields for septic tanks, must be located above 2,764.0 feet above sea level at Jeffrey Lake and the corresponding elevation at the Midway lakes. Jeffrey and Midway argue that this paragraph means that the living area of cabins must be above 2,764.0 feet, but that subterranean support structures such as footings and septic systems may be below 2,764.0 feet, or alternately that cabins may be constructed below 2,764.0 feet with prior permission. For this interpretation, Jeffrey and Midway rely upon the contents of paragraphs 14, 15, and 16 of the leases; the parties' prior course of practice; and the word "generally" in paragraph 13 of the Jeffrey lease. Because this contract is unambiguous, we do not consider extrinsic course of conduct evidence in interpreting the parties' intent. See *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 291 Neb. 642, 868 N.W.2d 67 (2015). We will address the construction of the word "generally" in the corresponding separate assignment of error section below. We turn now to Jeffrey and Midway's arguments about the construction of paragraphs 14, 15, and 16 and their impact on paragraph 13.

Paragraphs 14, 15, and 16 of the two leases contain identical language. These paragraphs provide:

(14) Any permanent reconstruction or new construction of private resident cabins and related structures in the present designated areas located below or within the lake freeboard area shall meet the requirements of [Central] as herein set forth and shall have written approval of [Jeffrey/Midway] prior to the beginning of any work.

(15) Prior to any permanent, new construction of private resident cabins and related structures in an extension of a present cabin area, [Jeffrey/Midway] shall, at its expense and with the assistance of [Central's] authorized engineer, determine and designate on the ground and/or area lot plat the lower limits of said permanent, new construction. When this has been done, the sublessee of any such lot shall submit plans to [Jeffrey/Midway] for all proposed construction on said lot. In the event [Jeffrey/Midway] decides there is or may be a conflict or non-compliance of proposed construction on the part of a sublessee or for any other reason, [Jeffrey/Midway] shall submit such proposals or questions to [Central] for a decision which shall be provided in writing.

(16) Any permanent construction, such as private residences, garages and related structures as mentioned in the above three paragraphs, shall be placed on concrete slabs, foundations or bases and sufficiently bolted thereto so that such structures shall not enter into the lake or into [Central's] works of improvement. Any permanent shoreline structures, such as boat docks, boat storage facilities, stairways and related structures, shall be constructed and anchored in such a manner whereby they will not be allowed to enter into the lake during normal or high water level. [Jeffrey/Midway] and/or the sublessee shall be liable to [Central] for any damage done to [Central's] property by reason of any structure or debris becoming loose and entering the lake, including the cost to [Central] of removing the same. Any sublessees so occupying or constructing any of the above-mentioned structures shall recognize and understand that such premises, structures and contents

thereof may become flooded, and that [Central] shall assume no responsibility or liability of any kind whatsoever for damages.

Jeffrey and Midway urge us to interpret paragraphs 14 through 16 to impliedly authorize construction of at least some part of cabins below the freeboard elevations described in paragraph 13 of each lease. We cannot read these paragraphs to affirmatively authorize construction of cabins or parts of cabins below freeboard elevation. Paragraph 15 provides for construction in areas that were not platted as cabin areas at the time of the contract. We do not find any language in paragraph 15 that modifies the elevation restrictions for residential cabins contained in paragraph 13. Instead, paragraph 15 notes that those restrictions will extend to new cabin areas and requires elevation surveys of construction in new cabin areas to ensure compliance. Similarly, we do not read paragraph 16 to imply authorization to build below freeboard elevation. Paragraph 16 contains additional rules for anchoring construction to prevent structures from washing into the lake. It provides one set of anchoring requirements for residences, garages, and related structures and a separate set of anchoring requirements for "permanent shoreline structures, such as boat docks, boat storage facilities, stairways and related structures." We do note the significance of paragraph 16's statement that "the above three paragraphs" mention construction of cabins and related non-shoreline structures. We will explain this significance further below.

Paragraph 14 provides the brunt of Jeffrey and Midway's textual argument that cabin construction below freeboard elevation is authorized. This paragraph generally deals with approval processes for construction on designated cabin areas below freeboard elevation. Jeffrey urges us to read this paragraph to mean that construction of cabins and related structures is permissible below freeboard elevation so long as the builder obtains prior written approval of Jeffrey or Midway. We cannot give this paragraph this construction. First, this paragraph does not affirmatively authorize Jeffrey and Midway to approve exemptions to the elevation requirements to which they agreed in paragraph 13. Rather, the paragraph specifically states that any construction referenced in Paragraph 14 must meet the requirements of Central **and** have written permission from Jeffrey or Midway. It does not say that construction must meet Central's requirements **or** have written permission [to waive the requirements]. One of those requirements is Paragraph 13's elevation requirements for residence cabins. Further, the written permission referenced in Paragraph 14 is written permission from **Jeffrey or Midway**, not from Central. Jeffrey and Midway's proposed interpretation would gut paragraph 13's elevation restrictions by allowing Jeffrey or Midway to unilaterally exempt their sublessees from Jeffrey and Midway's commitments to Central not to allow construction of private residence cabins below freeboard elevation. For these reasons, we cannot read the plain language of Paragraph 14 as a variance mechanism to allow construction below freeboard elevation if Central gives prior written permission.

Jeffrey alternatively proposes that the parties intended for "related structures" to cabins such as footings and subterranean sewage systems to be placed below freeboard elevation and that paragraph 14 provides the procedures for allowing these subterranean structures related to cabins. However, Jeffrey relies primarily upon extrinsic evidence for this argument that we cannot consider given our determination that the contract is not ambiguous. See *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 291 Neb. 642, 868 N.W.2d 67 (2015). Further, the unambiguous,

plain language of paragraphs 13 through 16 make no exception for the placement of subterranean cabin structures to be allowed below freeboard elevation. Jeffrey argues that footings and other subterranean improvements may be considered as "related structures" rather than "cabins." Even if we consider footings of cabins to be "related structures," this does not obviate paragraph 13's requirement that "cabins and related structures" be placed above freeboard elevation. Jeffrey and Midway make no argument that footings should qualify as a shoreline or water-access related structure, which is the only exception to paragraph 13's prohibition against constructing "cabins and related structures" below freeboard elevation.

Jeffrey and Midway argue that if we do not find construction of cabins or footings to be permitted below 2,764 feet, that paragraph 14 is meaningless because it references construction that is prohibited in paragraph 13. We disagree. Paragraph 14 requires that any "construction of private residential cabins and related structures in the present designated areas located below or within the lake freeboard area" meets Central's requirements contained in the leases. We agree with Central's interpretation of "in the present designated areas located below or within the lake freeboard area" to mean the **areas** designated for lease that are located below or within the lake freeboard area. This interpretation is reasonable given other provisions contained in the lease. For example, paragraph 13 permits construction of boat docks and related structures "below said lake freeboard contour elevation"; Paragraph 15 refers to construction "in a new cabin area located below or within the lake freeboard area." Furthermore, we previously determined that "the leased premises extend to the shoreline, including areas both above and below the freeboard line." *Jeffrey Lake Development v. Central Nebraska Pub. Power*, No. A-02-106, 2004 WL 2216494 at *11 (Neb. App. Oct. 5, 2004). Therefore, if a sublessee seeks to construct on this below elevation land, paragraph 14 clarifies that Central's elevation and other construction requirements must still be met and reiterates that cabins may not be built at-will in any area designated as a "cabin area."

Although the district court's order did not include a discussion of paragraphs 14 through 16, we have independently reviewed them and conclude that the lease provisions, when read together, do not authorize construction of cabins and their related structures in disregard of paragraph 13's elevation requirements.

*Retaining Walls, Wells, and Erosion Control Designation.*

Jeffrey and Midway separately assign that the district court erred in categorizing "retaining walls and erosion control structures" as "boat docks and related structures" and in determining that public wells are to be treated differently from other structures related to cabins under the terms of the lease. However, Jeffrey and Midway's argument on these assignments relates to their broader argument that Central's course of performance was to allow "residence cabins and related structures" to be built below the lake freeboard elevation and that this course of performance should be considered in interpreting the intent of the parties to allow such construction below paragraph 13's specified freeboard elevations. Because the contract is unambiguous, we cannot consider this extrinsic evidence in our interpretation of the contractual provisions. Therefore, these assignments of error are irrelevant to our disposition of the case. An appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it. *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 291 Neb. 642, 868 N.W.2d 67 (2015). We therefore do not address these arguments.

*Interpretation of Word "Generally" in Jeffrey Lease.*

Both parties assign that the district court erred in its adoption of our *Jeffrey VI* definition of the lease term "generally." The term appears in paragraph 13 of the Jeffrey lease in the phrase "[a]ll permanent construction of private residence cabins and related structures shall be placed generally above the freeboard contour of the lake which is Elevation 2764.0 feet above sea level, U.S.G.S. datum, except that boat docks . . . ." The term does not appear in the Midway lease. In *Jeffrey VI*, we considered evidence that Central had measured the bottom elevation of a guest house on Jeffrey Lake at 2,761.34 feet above sea level. *Jeffrey VI, supra.* We held that although this measurement was below the 2,764-foot elevation required in paragraph 13, this was not a material breach because:

> The Jeffrey lease required only that improvements be located 'generally' above [freeboard elevation], which it determined to be 2,764 feet. . . . Considering these measurements, and the plain language meaning of the term "generally," this is not a material breach. The Jeffrey lease does not require absolute compliance with elevation requirements, and the elevation of the building in question is very close to 2,764 feet.

*Id.* Central urges us to rewrite the sentence to read "'*Generally*,' all construction is to be placed above elevation 2764, '*except that* boat docks' and structures for water access need not be." Jeffrey and Midway suggest that we construe "generally" to mean that the cabins and their related structures, such as footings and subterranean sewage systems, must as one unit generally be placed above the freeboard elevation but may partially be placed below that elevation. We decline to adopt either proposed alternative definition. Neither party has asserted that this contract is ambiguous, and our prior interpretation of the same contractual language to allow near compliance but not strict compliance with the elevation restriction is controlling. The district court did not err in applying our definition of "generally" from *Jeffrey VI*.

*Extent of Jeffrey VI Injunction.*

In *Jeffrey VI*, the district court issued a broad injunction against Central. On appeal, we struck the following sentence from the district court's order:

> Therefore, the Court finds that [Central] should be enjoined from taking any actions to declare a violation or breach of the contract and lease agreement entered into between [Jeffrey and Midway] and [Central] or to take any actions declaring a violation or breach in regard to any of the sublessees as set out in the letter of November 14, 2006.

*Jeffrey Lake IV, supra* at *17. We replaced the stricken sentence with the substitute: "Central is enjoined from declaring a forfeiture of the Jeffrey lease or the Midway lease based on any of the alleged violations regarding which Central adduced evidence at trial." *Id.*

In the present appeal, both parties assign that the district court erred in the extent of its application of the *Jeffrey VI* injunction. Jeffrey and Midway argue that the estoppel provisions contained in the trial court's order should not "only apply to construction at Jeffrey Lake and Midway Lake upon which evidence was produced at trial on April 14, 2009" because this is an unworkable provision. Central argues that the *Jeffrey VI* injunction should not apply to repair or

replacement of the structures because the issue on appeal in *Jeffrey VI* was lease forfeiture, not lease enforcement. We disagree with both arguments.

Although Central is correct that the primary issue on appeal in *Jeffrey VI* was lease forfeiture, the underlying trial court action also dealt with whether Central could enforce certain lease violations. The trial court order from J*effrey VI*, of which we take judicial notice stated:

> Finding no violations, or finding only violations that have been acquiesced in by the Defendant, the Court finds that the Defendant should be enjoined and restrained from declaring any violations or breaches of the lease agreement between the Plaintiffs and the Defendant or any alleged breaches by the sublessees of the Plaintiffs.

Accordingly, it is clear from the full context of the trial court order that lease violations were at issue and we intended the trial court's injunction against Central finding violations based upon the evidence at trial to remain in effect. Accordingly, the district court in the present action did not err in extending this injunction to cover repair and replacement of those same structures that were at issue in the trial underlying *Jeffrey VI*.

We also find no merit to Jeffrey and Midway's concern that limiting the injunction in this manner is unworkable. Public records of court proceedings exist and the voluminous re-introduction of many of the exhibits from *Jeffrey VI* in the present case show that the parties are in fact able to access information regarding the evidence at issue in the trial underlying *Jeffrey VI*. This assignment of error is without merit.

*Central's Permitting Procedures.*

Jeffrey and Midway next assign that the district court erred in failing to issue an injunction preventing Central from denying permits to construct structures that comply with Central's permitting procedures even if those structures violate the more-restrictive elevation requirements contained in the Jeffrey and Midway leases. We disagree that the district court erred in failing to issue such an injunction. An injunction is an extraordinary remedy that ordinarily should not be granted except in a clear case where there is actual and substantial injury. *Hogelin v. City of Columbus*, 274 Neb. 453, 741 N.W.2d 617 (2007). Such a remedy should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Id.*

Jeffrey and Midway signed their respective leases with Central. These leases do not require payment of rent. They do require Jeffrey and Midway to assume certain maintenance and liabilities of the leased premises, and to assure compliance with certain building restrictions including elevation requirements. We have previously noted that an injunction broadly preventing Central from enforcing these requirements would make the lease entirely one-sided in Jeffrey and Midway's favor. (*Jeffrey VI*). Nothing in the language of the leases allows Jeffrey and Midway to escape the terms of their agreement simply because Central's permitting procedures would allow more permissive building standards if not for the leases.

The permitting procedures themselves make clear that this is not the intended consequence, stating that "to the extent that leases or other contractual agreements impose additional or more restrictive conditions[,] . . . such additional or more restrictive conditions shall also apply." The existence of the more-permissive standards in the permitting procedures document does not create

a "failure of justice" that requires an injunction against Central enforcing the terms of the parties' bargained-for lease agreements. See *Hogelin v. City of Columbus*, *supra*. Accordingly, the district court did not err in denying this relief and this assignment of error is without merit.

*Bad Faith.*

Although Jeffrey and Midway's argument on this assigned error is somewhat difficult to ascertain, it appears they are arguing that Central's motivation for requiring strict compliance with the elevation requirement should impact our interpretation of the lease. As evidenced by prior litigation, Central has tried on various occasions to terminate the leases in an effort to renegotiate them to include a rent provision. The district court found that "motivation in seeking to enforce legal rights under the leases is immaterial, and even if based on malice only applies to determining the credibility of the evidence." We agree.

In their brief, Jeffrey and Midway make references to the implied covenant of good faith and fair dealing. Although evidence of bad faith would be relevant to a claim for breach of this covenant, Jeffrey and Midway did not plead breach of the implied covenant of good faith and fair dealing. The only implied covenant that their pleadings assert Central breached is the implied covenant of quiet enjoyment, which is not at issue on appeal. Accordingly, motivation is not relevant to any issue on appeal and we therefore find no error by the district court in including this correct statement of law in its order.

*Attorney Fees.*

Jeffrey and Midway finally assign that the district court erred in denying attorney fees. On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). A party may recover attorney fees and expenses in a civil action only when a statute permits recovery or when we have recognized and accepted a uniform course of procedure for allowing attorney fees. *Evertson v. City of Kimball*, 278 Neb. 1, 767 N.W.2d 751 (2009). Jeffrey and Midway claim attorney fees under Neb. Rev. Stat. § 25-824 (Reissue 2008) which authorizes fees against a party who has defended a civil action with a claim that a court determines is frivolous or made in bad faith. Because neither the district court nor we have found that any of Central's defenses were frivolous or made in bad faith, we find no abuse of discretion in the trial court's denial of attorney fees.

*Res Judicata.*

Central assigns that the district court erred in failing to find Jeffrey and Midway's claims barred by res judicata. Res judicata is an affirmative defense which must be specifically pled. Supreme Court Rule § 6-1108(c). Because Central failed to plead res judicata in its answer, we will not address this argument made for the first time on appeal. *Leseberg v. Meints,* 224 Neb. 533, 399 N.W.2d 784 (1987).

*Waiver.*

Central assigns that the district court erred in failing to find that Jeffrey and Midway's claims are barred by the doctrine of waiver. We disagree. A waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an

inference of the relinquishment of such right. *Omaha Police Union Local 101 v. City of Omaha*, 292 Neb. 381, 872 N.W.2d 765 (2015). To establish a waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his or her part. *Id.* A party may prove the waiver of a contract by (1) a party's express declarations manifesting the intent not to claim an advantage or (2) a party's neglecting and failing to act so as to induce the belief that it intended to waive. *Id.* The party asserting a waiver defense bears the burden of establishing that a clear and unmistakable waiver has occurred. *Id.*

Central submits that Jeffrey waived rights to enforce a favorable interpretation of the lease by remaining silent after being informed that subterranean support structures for cabins must be built above the freeboard elevation. In support of its argument, it points to two 2007 letters sent to sublessees advising of the elevation requirement. We note, however, that Jeffrey did not "remain silent" regarding Central's actions in declaring lease violations based on elevation; to the contrary, in 2007 when these letters were sent, the parties were already embroiled in litigation leading to *Jeffrey VI*. As set forth above, lease violations based on elevation were involved in that litigation. Therefore, although the issue of whether component parts of residential cabins could be placed below the minimum elevation levels was not specifically litigated, given the ongoing litigation between the parties, the district court did not err in finding no clear, unequivocal, and decisive act of Jeffrey to support a waiver. This assignment of error is without merit.

## CONCLUSION

Having reviewed the record, we agree with the construction of the lease and our former case law applied by the trial court. Accordingly, we affirm its judgment.

AFFIRMED.